CLERK'S OFFICE
A TRUE COPY
Mar 21, 2025
s/ K. Reed
Deputy Clerk, U.S. District Court
Eastern District of Wisconsin

# UNITED STATES DISTRICT COURT
### for the
### Eastern District of Wisconsin

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) ) ) | Case No.    25    MJ    44 |
| INFORMATION ASSOCIATED WITH "MARGARET@MINERICKLOGGING.COM," AN EMAIL ADDRESS CONTROLLED BY GOOGLE, LLC. MATTER NO. 2024R00186 | ) ) ) | |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See Attachment A.

located in the    **Northern**    District of    **California**   , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ❑ contraband, fruits of crime, or other items illegally possessed;
- ❑ property designed for use, intended for use, or used in committing a crime;
- ❑ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 29 U.S.C. § 666(e) and 216(a); 18 U.S.C. § 1001, 1505 and/or 1519 | Willful OSHA Violation Causing Death; Willful Employment of Oppressive Child Labor; False Statements; Obstruction |

The application is based on these facts:

See Attached Affidavit.

- ☑ Continued on the attached sheet.
- ❑ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

MATTHEW ROBERTS   Digitally signed by MATTHEW ROBERTS
Date: 2025.03.20 10:00:16 -04'00'

*Applicant's signature*

Matthew Roberts U.S. Dept. of Labor Special Agent

*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone _____ *(specify reliable electronic means)*.

Date:    03/21/2025

*Judge's signature*

City and state:    Milwaukee, Wisconsin      William E. Duffin, U.S. Magistrate Judge

*Printed name and title*

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, Matthew Roberts, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application for a search warrant for information associated with an email account that is stored at premises owned, maintained, controlled, or operated by Google, LLC, "Google," an electronic communications service and/or remote computing service provider headquartered at 1600 Amphitheatre Parkway, Mountain View, California 94043. The information to be searched is described in the following paragraphs and in Attachment A.  This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Google to disclose to the government copies of the information (including the content of communications) further described in Section I of Attachment B.

2.      Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

3.      I am a Special Agent with the U.S. Department of Labor, Office of Inspector General, Office of Investigations-Labor Racketeering and Fraud (DOL-OIG/OI-LRF) and have been so employed since January of 2022. Prior to this

1

assignment, I was a Special Agent with the U.S. Fish and Wildlife Service from September of 2019 to January of 2022. I am currently assigned to the Detroit Field Office of DOL-OIG/OI-LRF. In my federal law enforcement career, I have received training and conducted numerous investigations concerning violations under Titles 18 and 29 of the United States Criminal Code. I have training from the Federal Law Enforcement Training Center (FLETC) in the investigation of criminal activity, including crimes involving fraud, obstruction, and false statements.

4.     This affidavit is intended to show merely that there is probable cause for the requested warrant and does not set forth all my knowledge on this matter.

## JURISDICTION

5.     This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A), & (c)(1)(A). Specifically, the Court is "a district court of the United States . . . that has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

## THE SUBJECT ACCOUNT

6.     MARGARET MINERICK uses the email account "margaret@minericklogging.com" (the SUBJECT ACCOUNT).  Based on the returns from a previously issued grand jury subpoena and Section 2703(d) Order, I know that Google maintains emails and related records for the SUBJECT ACCOUNT. As referenced throughout this affidavit, MINERICK has utilized the SUBJECT ACCOUNT to communicate with workplace safety consultants, state of

2

Wisconsin officials, and Department of Labor (DOL) officials providing pertinent information to the matters under investigation.

## OVERVIEW OF OFFENSES ADDRESSED IN THIS AFFIDAVIT

7.      Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that federal offenses related to workplace safety, child labor, environmental law, and false or obstructive conduct were committed by MARGARET MINERICK (DOB XX/XX/1955), RAYMOND MILLS (DOB XX/XX/1983), and/or FLORENCE HARDWOODS.  There is also probable cause to search the information described in Attachment A for evidence, instrumentalities, and/or fruits of these crimes further described in Attachment B.

### Identification of Relevant Individuals

8.      FLORENCE HARDWOODS is a lumber manufacturer based in Florence, Wisconsin. Inside FLORENCE HARDWOODS's sawmill building, raw logs are sawn into boards of lumber.  Lumber that is sold without being dried is "green lumber."   Lumber that is dried in kilns is "dry lumber" and may be further processed in the planer building, a structure adjacent to the sawmill building.

9.      Over the period generally addressed in this affidavit, the number of employees at FLORENCE HARDWOODS was variable and ranged from approximately 30 to approximately 80 employees.  Gross annual sales were between $18.5 million and $26 million for the years 2019-2022.

10.      MARGARET MINERICK ("MINERICK") is a co-owner of FLORENCE HARDWOODS with her husband, Robert Minerick.  MARGARET MINERICK has

3

been closely involved in the operations of FLORENCE HARDWOODS since at least 2015 and became a co-owner in approximately 2022 when the Minericks bought out the ownership interest of another individual. As a co-owner and controller of FLORENCE HARDWOODS, MARGARET MINERICK is an "employer" under the Occupational Safety and Health Act (OSH Act), which brings her within the reach of the OSH Act criminal provision discussed in further detail below. She is also an "employer" under the Fair Labor Standards Act (FLSA), which includes any person acting directly or indirectly in the interest of an employer in relation to an employee. 29 U.S.C. § 203(d).

11. MARGARET MINERICK is also the operator of or has ownership interests in other timber industry businesses in the same geographic area, including Minerick Logging (a timber trucking company with gross sales ranging between $14.9 million and $16.9 million for the years 2019-2022) and Sagola Hardwoods (a sawmill company with gross sales ranging between $11 million and $14.7 million in the years 2019-2022), each co-located in a facility in Sagola, Michigan, which is approximately 30 miles from Florence. According to bank documents, MARGARET MINERICK and her husband each have decades of experience in the timber industry in northern Wisconsin and the Upper Peninsula of Michigan.

12. MILLS is the Mill Manager of FLORENCE HARDWOODS. He has worked for FLORENCE HARDWOODS since its inception.

13. JORDAN DAVIS is the Office Manager of FLORENCE HARDWOODS,

4

and has been so employed since approximately March 2020.

14.     Pamela Burkhard (formerly Pamela Rukamp) is the former Office Manager of FLORENCE HARDWOODS who retired in approximately April 2023.

15.      Amy Orn is the former Human Resources manager for FLORENCE HARDWOODS who retired in approximately 2019.

## PROBABLE CAUSE

16.     This Affidavit sets out probable cause for the following offenses in the following order:

a.     FLORENCE HARDWOODS willfully violated a federal workplace safety standard promulgated under the OSH Act, and that violation caused death to a 16-year-old employee, Michael Schuls.  29 U.S.C. § 666(e) (criminal provision).

b.     FLORENCE HARDWOODS and MARGARET MINERICK corruptly obstructed or endeavored to obstruct the Occupational Safety and Health Administration's (OSHA) investigation of the Schuls fatality by falsely and misleadingly claiming that a lack of financial resources prevented the company from improving its safety compliance prior to the fatality.  18 U.S.C. § 1505 (obstruction of agency proceedings).

c.     FLORENCE HARDWOODS willfully violated the FLSA while employing oppressive child labor. 29 U.S.C. §§ 212(c); 215(a)(4) & 216(a).

d.     FLORENCE HARDWOODS AND MARGARET MINERICK willfully or corruptly made false, misleading, or fraudulent statements to DOL about the

5

volume of lumber that had been produced at the Florence facility in the 30 days prior to the Schuls fatality, which statements were material to DOL's efforts to prevent the shipment in commerce of "hot goods" produced at an establishment that employed oppressive child labor. 18 U.S.C. §§ 1001; 1505.

e. FLORENCE HARDWOODS, MARGARET MINERICK, and/or RAY MILLS knowingly falsified environmental compliance certifications required by the Clean Air Act. 18 U.S.C. §§ 1001(a)(3); 1519.

## WILLFUL OSHA VIOLATION CAUSING DEATH

### *The Occupational Safety and Health Act*

17. The OSH Act is the primary federal statute relating to workplace safety. 29 U.S.C. § 651 *et seq.* In Wisconsin, the OSH Act is administered and enforced by the OSHA, an agency within the United States Department of Labor (DOL). In Michigan, the OSH Act is administered and enforced by the Michigan Occupational Safety and Health Administration (MiOSHA), a state agency carrying out the duties of federal OSHA under delegated authority. *See id.* at § 667.

18. The OSH Act requires "employers" to, among other things, comply with occupational safety and health standards promulgated by OSHA under the OSH Act. *Id.* at § 654(a)(2). OSHA is authorized to conduct inspections and investigations at workplaces to carry out the purposes of the OSH Act, including to determine if an employer is complying with safety standards. *Id.* at 657. If OSHA believes that an employer has violated a safety standard, OSHA shall issue a citation to the employer describing the violation, including a reference to the

6

standard alleged to have been violated. *Id.* at 657(a). The citation must also fix a reasonable time for the employer to abate the violation. *Id.* OSHA may also propose a civil money penalty for violations identified in citations. *Id.* at § 666(a)-(c).

19. The OSH Act makes it a crime when an employer willfully violates a safety standard if the violation causes death to any employee. *Id.* at 666(e).

*The Energy Control Standard*

20. In or about 1989, OSHA promulgated a safety standard known as "The control of hazardous energy ('lockout/tagout', or 'LO/TO')" standard. 29 C.F.R. 1910.147 (hereinafter the "Energy Control Standard" or "Standard"). The purpose of the Energy Control Standard is to prevent injuries that would happen if, while an employee performs servicing and/or maintenance work on a machine, the machine unexpectedly energizes or starts up, causing the release of hazardous energy (e.g., hazardous electrical, mechanical, or kinetic energy).

21. The energy control procedures required under the Standard must begin with the following elements and actions, in the following sequence:

(1) Preparation for shutdown: Ensure the authorized employee knows the type and magnitude of the energy, the hazards of the energy to be controlled, and the method or means to control the energy.

(2) Machine or equipment shutdown: The machine or equipment shall be turned off or shut down.

(3) Machine or equipment isolation: An energy isolating device, such as a circuit breaker or disconnect switch, shall be operated to isolate the machine

7

or equipment from the energy source, such as the electrical power source. Id. at § 1910.147(d). In other words, and as relevant to the facts in this case, the first steps to performing compliant maintenance or servicing on a machine where unexpected machine start-up would be hazardous are to (1) educate the affected worker about the hazard and safety procedures, (2) shut the machine down and (3) disconnect the machine from a power source.

22. "Servicing and/or maintenance" is defined in the Standard to include such activities as setting up, adjusting, maintaining, or servicing machines or equipment. Significantly for this investigation, the Standard expressly includes within that definition the "unjamming of machines or equipment … where the employee may be exposed to the *unexpected* energization or startup" of the machine. 29 C.F.R. 1910.147(b).

23. To comply with the Energy Control Standard, an employer must establish an "energy control program" consisting of (1) energy control procedures, (2) trainings, and (3) periodic inspections, all to ensure that a machine is "isolated from the energy source and rendered inoperative…before any employee performs any servicing or maintenance on a machine or equipment where the unexpected start-up of machinery could occur and cause injury." *Id.* at 1910.147(c)(1).

24. The energy control procedures that an employer must develop, document, and utilize as part of its energy control program are machine specific. *Id.* at § 1910.147(c)(4)(i). The procedures must "clearly and specifically outline the scope, purpose, authorization, rules, and techniques to be utilized for the control of

8

hazardous energy," including "specific procedural steps for shutting down, isolating, blocking and securing machines or equipment to control hazardous energy. *Id.* at 1910.147(c)(4)(ii).

25. The Standard further mandates employee training on safe energy control procedures. The Standard defines "authorized employees" to include the employees who perform servicing or maintenance work covered by the Standard. *Id.* at § 1910.147(b) ("*Authorized employee*"). All employees who must work in an area where covered servicing or maintenance work is being performed ("affected employees") must be trained to ensure that they understand the purpose and function of an employer's energy control program and energy control procedure, while "authorized employees" must be further trained on the recognition of applicable hazardous energy sources, the type and magnitude of the energy available in the workplace, and the methods and means necessary for energy isolation and control. *Id.* at § 1910.147(c)(7)(i). Employees must be retrained whenever there is a change in their job assignments or a change in machines or processes that present a new hazard, or when there is a change in the energy control procedures. *Id.* at § 1910.147(c)(7)(iii).

*Death of Michael Schuls*

26. On June 29, 2023, 16-year-old employee Michael Schuls died while he was pinned between metal surfaces inside the FLORENCE HARDWOODS planer building. At the time of his fatal injury, Schuls was working to unjam sticks from a machine called the "desticker." Schuls inadvertently activated a photoelectronic

9

Case 2:25-mj-00044-WED    Filed 03/21/25    Page 10 of 56    Document 1

sensor that unexpectedly started up an automated machine function.

27.     The "sticks" at issue are slender pieces of wood that separate layers of palletized lumber.  Palletized lumber is separated by sticks so that all surfaces of the lumber are exposed to warm air during the kiln-drying process.  When pallets of lumber enter the planer building, they are broken down and the sticks are separated from the lumber.  The purpose of the desticker is to collect the sticks into carts so that they can be bundled together and carried back to the sawmill building where they are used to assemble new pallets.

28.     Under normal operations, the sticks are carried by a conveyor up and over the top of the desticker before falling through a chute and landing in a cart. The process is automated to load the carts in sections so that the sticks will pile up in an orderly way.  Photoelectronic sensors detect when a section of the cart is filled up, at which point the cart automatically moves down a track to allow another section of the cart to be loaded.

29.      The image below shows the desticker machine as viewed from the center of the planer building.  The sticks enter the machine via a conveyor on the far side of the image and travel by conveyor over the top of the machine.  The area where the sticks drop into the carts is visible in the center of the image, and the short track along which the carts move extends to the left side of the image.

10



30.     At the beginning of the loading process, a cart was positioned in such a way that a worker could position his or her body between the front end of the cart and a horizontal bar (highlighted in yellow below) that was part of the structure of the desticker machine.  The automated movement of the cart under the horizontal bar created a danger zone where an employee could become pinned if the machine was energized.  As the planer building supervisor, Matt Olesky, explained in interviews, the sticks sometimes jammed at the chute (area highlighted in red below).

11



31.     When the sticks got jammed, employees used a rake (seen in the image below) to clear the jam so the sticks would resume falling into the cart.



06/29/2023 15:34

32.    Schuls was injured when he entered the danger zone while trying to unjam sticks from the chute. Surveillance video captures the moments leading to Schuls's death. Schuls was working—alone—in the planer building, stacking lumber. The video shows that Schuls looked at the desticker machine and walked to a control panel. Schuls shut off the power to the lift hoist that depalletizes lumber and the chain conveyors that carry lumber through the planer building, which stopped the boards from piling up at the end of the lumber conveyor. However, Schuls did not shut off the power to the desticker, which continued to run. As discussed earlier, the first steps in a compliant energy control procedure are to shut down the machinery and isolate it from its energy source, which in this instance would have been accomplished not only by turning the desticker off (which

13

Schuls did not do) but also by disconnecting its energy source at a circuit breaker or similar disconnection device elsewhere in the planer building.

33. Schuls then walked to the desticker, grabbed the rake, and started to clear jammed sticks from the chute area. Although the machine was located on the far side of the building from the surveillance camera, the surveillance footage shows Schuls reaching up and pulling down in a motion consistent with raking sticks above him. Olesky told the police after the injury that Schuls had been raking sticks.

34. The video shows that Schuls then entered the danger zone described above. Almost immediately, his body was moved in a backwards direction and disappears behind an obstruction. Approximately 15 minutes later, Olesky entered the building and ran to the desticker. Olesky reactivated the machine to release Schuls' body, which fell limply to the ground.

35. Later that day, supervisor Olesky gave a videotaped demonstration of how Schuls became pinned when he tried to clear sticks and accidentally activated the photoelectronic sensor and caused the cart to move.

*Energy Control Procedures at the Time of the Fatality*

36. Based on the evidence obtained to date, FLORENCE HARDWOODS had a general energy control program at the time of the Schuls fatality, and some machine-specific energy control procedures for machines in the sawmill and planer buildings. However, according to statements made by MARGARET MINERICK and other FLORENCE HARDWOODS personnel to OSHA after the fatality, the

14

company had not developed an energy control procedure for the desticker, despite the automated function of the machine's photoelectronic sensor and the frequent need to clear the jammed sticks.

37. According to design and delivery documents, the desticker system was delivered to FLORENCE HARDWOODS in or about May 2014, over nine years before Schuls's death. As related in the sections below, FLORENCE HARDWOODS knew for years leading up to Schuls's fatality that it needed to have machine-specific energy control procedures where there was a risk of unexpected startup or the release of energy during servicing activities, including unjamming equipment.

38. Furthermore, a FLORENCE HARDWOODS manager had actual knowledge that the process for unjamming sticks from the desticker could result in a dangerous machine startup. After the fatality, planer building supervisor Olesky told OSHA that he had narrowly escaped injury doing the same thing that killed Schuls. Olesky said that two or three years prior to Schuls's death, Olesky tried to clear sticks from the desticker while the machine was still energized. Olesky entered the danger zone described above and inadvertently tripped the photoelectronic sensor. Olesky realized the machinery was activating and managed to quickly avoid becoming pinned. In the deposition, Olesky described his actions as "dumb" and blamed the manufacturer for the defective design.

39. Employee interviews and surveillance footage indicated that raking the jammed sticks without shutting down and locking out the system was common.

On or about June 20, 2023, a 14-year-old employee with the initials B.S.[1] was working in the planer building during his second week as a FLORENCE HARDWOODS employee. The desticker conveyor appears to stop. Olesky is seen on video directing B.S. to the desticker machine. B.S. climbs onto the machine and starts raking sticks. At the time, B.S. does not appear to be in the danger zone discussed above, but he is standing in an elevated (and unguarded) position on the desticker machine or on one of its carts and is close to the chute area. Olesky leaves the field of view of the surveillance camera while B.S. continues to rake sticks. Several minutes later, Olesky returns to the field of vision and walks back to the control panel for the desticker while B.S. is still standing on top of the machine, raking sticks. Olesky turns the stick stacker machine back on and the conveyor restarts while B.S. is in the elevated position raking sticks. Olesky does nothing to stop the machine or remove B.S. from the machine, and B.S. continued to rake sticks with the machine running for several minutes.

*Prior Energy Control Citations*

40. MARGARET MINERICK and FLORENCE HARDWOODS knew about OSHA's Energy Control Standard, and FLORENCE HARDWOODS and its related companies had received numerous citations for violating the Standard.

41. On or about November 24, 2008, MiOSHA opened an investigation at Sagola Hardwoods, and on or about January 21, 2009, MiOSHA issued six citations

---

[1] The names of minors referenced herein are known to law enforcement but are withheld from this affidavit.

16

including a "serious" citation for violating 29 CFR 1910.147(c)(4)(i), the provision of the Energy Control Standard that requires employers to develop, document, and utilize energy control procedures. Sagola Hardwoods ultimately paid a civil money penalty of $300 for the citation.

42. On or about July 29, 2010, MiOSHA opened another investigation at Sagola Hardwoods, which resulted in the issuance on or about September 9, 2010, of nine "serious" or "repeat" citations to the company, including a "repeat" citation for violating 29 CFR 191.147(c)(4)(i), the energy control procedures provision. Sagola Hardwoods ultimately paid a civil money penalty of $2,400 for the citation. During her 2023 deposition with OSHA, MARGARET MINERICK appeared to indicate that some of these MiOSHA citations related to the amputation of a hand.

43. On or about March 21, 2019, an employee of Minerick Logging was killed while performing servicing or maintenance work on a logging trailer without protection against the unexpected release of hazardous energy. On or about September 16, 2019, MiOSHA issued a citation to Minerick Logging for violating Subpart 1910.147(c)(4)(ii) of the Standard, the provision requiring machine specific energy control procedures. MARGARET MINERICK knew of the citation and personally corresponded with the State of Michigan in an unsuccessful effort to have the citation and penalty withdrawn. Sagola Hardwoods subsequently paid total penalties of approximately $14,000 for the violations.

44. On or about August 30, 2019, OSHA received a complaint alleging that two employees had been injured in separate incidents at the FLORENCE

HARDWOODS facility. The first employee was injured on August 1, 2019, when he was trying to clear jammed wood on a piece of equipment. The wood fell, which struck a stick that, in turn, struck the victim on the head, knocking him unconscious. The second employee was injured on August 20, 2019, when he was trying to clear a jam on a saw without stopping the equipment or notifying other employees in the area. Another employee threw a slab of wood in the area, inadvertently knocking the victim unconscious. On or about September 5, 2019, OSHA inspectors opened an inspection at FLORENCE HARDWOODS to investigate the complaint.

45. On or about September 16, 2019, while the double-injury investigation was ongoing, OSHA received a complaint of another injury at FLORENCE HARDWOODS, alleged to have occurred earlier that day and resulting in the amputation of toes. In that incident, an employee attempted to unjam a piece of equipment, which caused the unexpected release of gravitational energy and the collapse of heavy equipment onto his foot.

46. OSHA determined that each of the three injuries (in August and September 2019) stemmed from energy control violations, and that each of them occurred when employees were attempting to clear jams on equipment without shutting down machines. On or about January 15, 2020, OSHA issued citations stemming from the investigations. Among the citations issued was a multi-part citation for various energy control violations related to various specifically identified machines in the sawmill and planer buildings "along with numerous conveyors and

18

other equipment."  The desticker was not specifically identified in the citation. Among other energy control violations, the citation alleged that FLORENCE HARDWOODS failed to develop and use energy control procedures, failed to provide energy control training, and failed to require that machines be shut down and isolated from energy sources prior to attempting to clear jams.

*Need to Improve Energy Control Procedures*

47.     The OSH Act requires generally that employers follow promulgated safety standards, 29 U.S.C. § 654(a)(2), and more specifically, "abate" or "correct" violations or conditions that OSHA identifies in citations.  *Id.* at §§ 658(a); 659. On or about January 24, 2020, MARGARET MINERICK submitted to OSHA a certification of corrective action worksheet for the violations.  The submission included machine-specific energy control procedures for those machines that had been specifically identified in the OSHA citation, but not other machines or equipment.

48.     On or about March 9, 2020, an OSHA inspector emailed MARGARET MINERICK and told her that he had "some concerns about the level of detail in" the energy control procedures that MARGARET MINERICK had previously submitted as proof that the energy control violations had been abated.  The inspector provided MARGARET MINERICK with samples of sufficiently detailed energy control procedures and indicated that FLORENCE HARDWOODS's procedures needed to do a better job of identifying all potential sources of hazardous energy and be more specific and descriptive about the energy control procedures that needed to be

followed.

49. Later that day, MARGARET MINERICK responded to say that she had been in touch with a safety consultant and that the consultant was reviewing FLORENCE HARDWOODS's energy control policies and its personal protective equipment policies. MARGARET MINERICK told OSHA:

> [The consultant] has already given me a list of the policies that we are required to have. Quite frankly, the cost she quoted me of almost $20,000 to pull the policies together is cost prohibitive for us.

MARGARET MINERICK then told the OSHA inspector that FLORENCE HARDWOODS was in the process of looking at applications for a Safety/Health Director, "the time and cost of which we will share with another sawmill in our area." MARGARET MINERICK told the inspector that "The person we hire will be charged with putting together the policies that we are required to have." MARGARET MINERICK said that she would advise OSHA when a safety director was hired.

50. On or about April 13, 2020, another OSHA inspector reviewed FLORENCE HARDWOODS's abatement submission and told FLORENCE HARDWOODS he was "mark[ing] it as complete but [I] would like you to work on your Lockout/Tagout [Energy Control] Procedures with [a third-party consultant] to make them a bit more specific for the equipment."

51. In Fall 2020, FLORENCE HARDWOODS's human resources officer, JORDAN DAVIS, communicated with a WisCon safety consultant about FLORENCE HARDWOODS's safety program, including its energy control program.

20

WisCon is a free safety consulting service operated by the State of Wisconsin and federally funded under provisions of the OSH Act. The WisCon consultant provided DAVIS with numerous documents related to Energy Control Standard requirements and feedback about the inadequacy of FLORENCE HARDWOODS's existing energy control program and energy control procedures.

52. Previously, in early 2015, MARGARET MINERICK met with WisCon regarding a limited consultation of FLORENCE HARDWOODS's recordkeeping of OSHA 300 logs. MARGARET MINERICK discussed limiting the scope of the consultation visit "due to time constraints and limited personnel." MARGARET MINERICK stated to the consultant that her other company in Michigan "would provide information" on the required OSHA "written programs as well as assistance with (FLORENCE HARDWOODS') safety and health program. MARGARET MINERICK also limited the scope of WisCon's 2015 walkthrough assessment.

53. Based on the post-fatality documents that FLORENCE HARDWOODS provided in response to document requests and document subpoenas, FLORENCE HARDWOODS did not update or improve its energy control procedures prior to the fatality. The most recent procedures that FLORENCE HARDWOODS provided to OSHA after the Schuls fatality were the same procedures it had provided to OSHA in January 2020.

54. Based on the above, I believe there is probable cause that FLORENCE HARDWOODS willfully violated an OSHA safety standard, causing death to Schuls, in violation of 29 U.S.C. § 666(e).

55.     Based on my review, sufficient probable cause exists to believe that FLORENCE HARDWOODS and MARGARET MINERICK obstructed or endeavored to obstruct OSHA proceedings through false or misleading claims that economic hardship prevented the company from taking safety measures before the Schuls fatality.

*Representations to OSHA of Economic Hardship*

56.     As mentioned above, MARGARET MINERICK told an OSHA inspector in March 2020 that paying an outside consultant $20,000 to develop compliant safety policies was "cost prohibitive" to FLORENCE HARDWOODS, and she told the inspector that FLORENCE HARDWOODS would hire a safety director, the expense of which would be shared with other area sawmills.

57.     FLORENCE HARDWOODS never updated its energy control procedures and never hired the safety director that MARGARET MINERICK told OSHA it would hire.  Emails from May 2020 indicate that FLORENCE HARDWOODS advertised for a Safety Director on Indeed.com, an online job recruiting website.  The job listing offered a salary range of $40,000 to $60,000 annually.  In a November 2023 letter to OSHA, counsel for FLORENCE HARDWOODS stated that the company also advertised for a Safety Director on Zip Recruiter, another online recruiting website.

58.     During her October 2023 deposition as part of OSHA's investigation of the Schuls fatality, MARGARET MINERICK stated that FLORENCE

HARDWOODS did not hire a safety director because of financial concerns. MARGARET MINERICK testified that the job listing only received one interested candidate, someone from California, who MARGARET MINERICK did not communicate with because she assumed that the applicant would require a salary that she could not pay. MARGARET MINERICK also testified that "we discussed" hiring someone to be a safety director over all her related companies (FLORENCE HARDWOODS, Sagola Hardwoods, and Minerick Logging) but "no effort" had been made and "we haven't done" anything to make that happen. When asked if "financial concerns" were the reason for the inaction on hiring a safety director, MARGARET MINERICK replied "There's big financial concerns. Which is why we're looking at training somebody in-house to do some of these things." When asked if financial concerns were "the primary reason you haven't gone and got somebody else," MARGARET MINERICK answered "Correct."

59. Instead of hiring a dedicated safety director, FLORENCE HARDWOODS tasked DAVIS, the human resources specialist who began in approximately March 2020, with attempting to learn the requirements of the OSHA law. DAVIS continued to perform his other, non-safety related duties throughout his employment, and was subsequently promoted to Office Manager. (Note also that a February 2020 settlement agreement that MARGARET MINERICK signed to resolve the 2020 OSHA citations required FLORENCE HARDWOODS to obtain third-party safety program support for three years, i.e., between February 2020 and February 2023. WisCon provided limited, free consultative services to FLORENCE

23

HARDWOODS (including DAVIS) through Fall 2020, but the records provided to OSHA during the 2023 investigation indicate that FLORENCE HARDWOODS did not obtain additional third-party safety program assistance after 2020.)

60. Statements and testimony by MARGARET MINERICK about FLORENCE HARDWOODS's financial position were relevant to issues implicated in OSHA's investigation of the Schuls fatality, including whether FLORENCE HARDWOODS had an "economic infeasibility" defense to violations, had willfully violated the OSH Act, or was able to pay civil penalties.

*Evidence of Financial Condition*

61. Based on bank records and tax returns, FLORENCE HARDWOODS was financially able in 2020 to pay $20,000 to bring its safety policies into compliance or a salary amount substantially higher than $60,000 (the top amount listed in the Indeed.com job posting) to hire a dedicated safety director. Such sums were not "cost prohibitive" or "big financial concerns" for the company, as MARGARET MINERICK claimed, and economic hardship was not the "primary reason" why a safety director was not hired.

62. According to a February 21, 2020, memo from FLORENCE HARDWOODS's loan officer at its bank, FLORENCE HARDWOODS was experiencing increasing profits at the time due to machine automation and had $7.1 million in "current" (more liquid) assets, mostly inventory.

63. A December 16, 2020, memo from the bank stated that "2019 was a record sales year and 2020 looks to break that record." Cash flow for all of 2019 was

24

$1.34 million, and through the first three quarters of 2020 was $1.64 million. The memo also included historical information showing positive cash flows for the preceding years ($1.7 million in 2018, $467,000 in 2017, and $524,000 in 2016).

64. According to the company's 2021 tax return, FLORENCE HARDWOODS had gross sales that year of over $26 million, gross profit of $2,218,015, and net income of $748,158. The balance sheet for 2021 showed total current assets of $6,899,882, including $5,524,532 of inventory.

65. According to a July 6, 2023, bank memo, sales were at "an all time high in 2022" and grew $7.8 million over the previous year, with an increased gross profit margin of $900,000.

66. In addition to its own assets and cash flows, bank records indicate that FLORENCE HARDWOODS received loans or transfers on occasion from other companies owned by MARGARET MINERICK or other Minerick family members, or from the Minericks themselves who were listed as guarantors on the loans and lines of credit issued by the bank to FLORENCE HARDWOODS. According to an analysis in bank loan documents of the MINERICKS's personal finances in 2022, the MINERICKS had an adjusted net worth of over $18 million dollars, and annual excess cash of over $1.8 million.

67. Based on the above, I believe probable cause exists to conclude that MARGARET MINERICK and FLORENCE HARDWOODS knowingly and willfully, or corruptly, made false claims to OSHA about the company's inability to afford safety compliance costs before Schuls's death.

25

68. I believe there is probable cause that FLORENCE HARDWOODS willfully violated the FLSA's prohibition on employing "oppressive child labor" in the production of goods for commerce. 29 U.S.C. §§ 212(c); 215(a)(4); 216(a).

*Oppressive Child Labor Under the Fair Labor Standards Act*

69. The FLSA makes it a crime for any employer to willfully employ "oppressive child labor" in the production of goods for commerce. As a general matter, "oppressive child labor" means *inter alia* (1) the employment of any child under the age of sixteen years in "manufacturing," (2) the employment of any child under the age of eighteen in certain "hazardous occupations" (HOs) designated by FLSA regulations, or (3) the employment of any child under the age of sixteen during times and for such hours as prohibited by FLSA regulations. 29 U.S.C. § 203(*l*). Substantially the same restrictions on child labor are imposed under Wisconsin state law. Wisconsin Administrative Code Part 270.

70. *Manufacturing Jobs*: The general prohibition on child labor in manufacturing occupations is set forth in both federal law and in the state law of Wisconsin. 29 U.S.C. § 203(*l*); 29 C.F.R. § 570.33(a).

71. *Sawmill Jobs (HO Order 4)*: Under the federal and state child labor regulations, minors of any age (including those 16 and 17 years old) may not be employed in certain sawmill occupations. 29 C.F.R. § 570.54. Minors of any age are prohibited from occupations "in the operation of any sawmill", which includes all work performed in or about any such mill in connection with storing logs,

26

converting logs into sawn lumber, storing lumber, drying lumber, and shipping lumber, and other work performed in the operation of any sawmill. 29 C.F.R. §§ 570.54(a) & (b) (definition of "All occupations in the operation of any sawmill").

72. Occupations in the "planing-mill department" of a sawmill are not prohibited by HO Order 4, and neither are occupations in office areas or maintenance shops. *Id.* Minors between the ages of 16 and 18 may also work with lumber and pull lumber from the "dry chain" but not if such work entails entering the sawmill building. 29 C.F.R. § 570.54(a)(8).

73. *Power-Driven Woodworking Jobs (HO Order 5)*: No matter the location, minors may not be employed in occupations involving the operation of power-driven woodworking machines, which includes all power-driven machines used for cutting, shaping, forming, or surfacing lumber. 29 C.F.R. § 570.55. "Operating" a power-driven woodworking machine includes supervising or controlling the operation of such machines, feeding material into such machine, and helping the operator to feed material into such machines. *Id.* at § 570.55(a)(1).

74. *Times and Hours Restrictions*: Finally, under federal and state law, children under 16 years old may not be employed before 7 a.m. or after 7 p.m. (after 9 p.m. during summer), for more than 40 hours in any one week when school is not in session, for more than 18 hours in any one week when school is in session, for more than eight hours in any one day when school is not in session, or more than three hours in any one day when school is in session. 29 C.F.R. 570.35(a).

*Employment of Children in Violation of Federal Child Labor Law*

27

75. The Wage and Hour Division (WHD) is an agency of the Department of Labor responsible for enforcing certain laws affecting employers and employees including aspects of the FLSA regulating child labor. WHD conducted an inspection at FLORENCE HARDWOODS upon notification of the fatal injury of Schuls in June 2023.

76. Payroll records, verified dates of birth, facility video, and interview statements obtained by the WHD indicate that FLORENCE HARDWOODS extensively employed minor workers in violation of the FLSA child labor regulations. Workers under the age of 16 routinely worked in manufacturing positions in the planer building. Workers under the age of 18 routinely operated power-driven woodworking equipment in the planer building. (Employee interviews and surveillance video from June 2023 indicate that the minor workers operated power-driven woodworking equipment, including rip saws and miter saws.) Workers under the age of 18 were also assigned work inside the sawmill building. (Employee interviews indicated that minors worked in "the hole," an area of the sawmill where workers handled lumber, and in the stick stacker, where minors loaded "sticks" into automatic machines that palletized lumber before it was taken to the kiln.) And minor workers routinely worked at hours and times that violated the law, including frequent work beginning at 5 a.m. or earlier.

77. Evidence related to specific minor employees includes:

a. A.A. was employed while s/he was 15-years old beginning in the summer of 2022 in a manufacturing occupation and during times

(beginning at approximately 4 a.m.) prohibited. Her/his employment continued after s/he turned 16 and included prohibited operation of power-driven woodworking equipment, including the ripsaw and chop saw in the planer building and at the stick stacker in the sawmill building.

b.  B.S. was a 14-year-old who went to work in a manufacturing occupation at FLORENCE HARDWOODS in June 2023, two weeks before the Schuls fatality, including at prohibited hours (beginning at 5 a.m.) and performing prohibited work with powered woodworking equipment. B.S. was injured unloading the rip saw and suffered bruising.

c.  D.B. went to work at FLORENCE HARDWOODS on June 22, 2022, the day before turning 14 years old, and continued to work there under the age of 16 from June 2022 through June 2023. D.B. routinely worked at prohibited hours (starting at 5 a.m. in the summer, and on occasion during the school year, and sometimes working to 8 pm).

d.  Decedent Michael Schuls was employed at FLORENCE HARDWOODS while he was 14 and 15 years old from the period November 2021 through June 15, 2023, when he turned 16. During that time, he frequently worked into the early evenings past 7 p.m. while school was in session, in violation of the times

29

regulation. During summers he frequently worked beginning at approximately 5 a.m., in violation of the times regulation.

e. B.W. worked at FLORENCE HARDWOODS in June and July 2021 at 15 years old, in a manufacturing occupation and during hours prohibited by federal law.

f. B.K. worked as a 14 and 15-year-old at FLORENCE HARDWOODS from June 2021 until October 2022, when s/he turned 16. B.K. commonly worked at times and for such hours as prohibited by law while school was in session, and while school was out of session. After turning 16, B.K. continued to perform prohibited work at FLORENCE HARDWOODS, including the operation of power-driven machinery and work inside the sawmill building at the stick stacker and "the hole."

g. A.M. worked as a 15-year-old at FLORENCE HARDWOODS during the summer of 2021 and during the fall semester of the 2021 school year, including during prohibited times.

h. S.B. worked as a 15-year-old during the summer of 2021, fall of 2021, winter of 2021-22, and spring of 2022, and at times prohibited (including starting at 5 a.m. on school days). S.B.'s work continued as a 16-year-old until June 2023. S.B.'s work occasionally involved prohibited labor inside the sawmill building. S.B. suffered multiple injuries at FLORENCE HARDWOODS.

30

i.    E.K. worked in prohibited occupations at FLORENCE HARDWOODS while s/he was 16 years old, from September 2022 until June 2023, including prohibited work inside the sawmill building and the operation of power-driven woodworking machinery.

78.    Video footage from the planer building corroborates that minors under the age of 16 worked in the building, and that minors under the age of 18 operated powered woodworking equipment, which was prohibited to all minors. The footage shows that the planer building was primarily staffed by minor workers, a fact later confirmed by office manager JORDAN DAVIS during an interview with this Affiant.

### Knowledge of the FLSA Violations

79.    Based on a review of information obtained during the investigation, I believe there is probable cause that FLORENCE HARDWOODS knew that its employment of minors was unlawful.

80.    Information about federal child labor restrictions, and substantially identical state restrictions, is easily available online. The Wisconsin Department of Workforce Development (DWD) website provides guides to the state child labor restrictions, which mirror the federal restrictions in relevant part here, and have links to the Wisconsin statutory and regulatory provisions. During a September 2024 interview with an experienced child labor regulator in Wisconsin DWD, this Affiant confirmed that information about the child labor restrictions has long been available on the agency's website. The website for the WHD also contains readily

31

available information about prohibited occupations and links to the federal child labor regulations.

81. This Affiant interviewed FLORENCE HARDWOODS office manager (and former human resources specialist) JORDAN DAVIS in September 2024. DAVIS started working at FLORENCE HARDWOODS in approximately March 2020, and DAVIS stated during his interview that he knew from the beginning of his employment that FLORENCE HARDWOODS employed minor workers.

82. The FLORENCE HARDWOODS facility is not large, and employed between approximately 30 and 80 workers at any given time. The planer building, where many of the minors worked, was located in a building adjacent to the main office/sawmill structure, where DAVIS's office was located. According to payroll records and confirmed during an interview, DAVIS typically arrived for work around 8 or 9 a.m.

83. DAVIS stated that he was aware from the beginning of his employment that minors worked in the planer mill. DAVIS stated he knew minors worked around the planer and rip saws in the planer building. DAVIS stated that the majority of workers in the planer building were kids. DAVIS claimed that he looked up the restrictions on the kind of work that minors could do "in sawmills," and suggested that he did not know about the prohibition on employing minors under age 16 in any manufacturing occupation. (Note: There are separate prohibitions on child labor related to "manufacturing" occupations (workers under 16) and hazardous occupations including inside sawmill buildings (workers under

32

18).)

84. DAVIS told this Affiant that he reviewed the regulations and that FLORENCE HARDWOODS "seem[ed] to be within regulations." When asked what caused him to look at the child labor law, DAVIS answered "curiosity" and the desire to "brush up on all sorts of labor laws." DAVIS stated that, when he went to work at FLORENCE HARDWOODS, he was in human resources and "towards the beginning" he checked the DWD website on state child labor prohibitions to check and see if the child labor was permitted.

85. DAVIS told this Affiant that he "believes" that he looked at the hours and times restrictions. DAVIS stated he knew that kids started working at FLORENCE HARDWOODS at 5 a.m., but "not during school days" and only "in the summer" or "times when school wasn't in session." (Note: the federal child labor law sets times and hours restrictions for workers under 16 to include prohibiting work before 7 a.m., while the Wisconsin law at some point also prohibited the employment of workers aged 16 or 17 before 7 a.m. on school days or before 5 a.m. on non-school days.) DAVIS denied knowing that minors worked in the mornings at FLORENCE HARDWOODS during school days. DAVIS admitted that he saw the times and hours that minor employees worked when he "did payroll" but that violations "never jumped out to me." DAVIS denied ever auditing for compliance with the child labor laws, and said that the minor employees "kind of did their own thing" and "I didn't interact with them a whole lot."

86. When asked if he was aware that FLORENCE HARDWOODS

33

employed 14-year-olds, DAVIS responded that the "first" 14-year-old of which he was aware was B.S., the 14-year-old who started working at FLORENCE HARDWOODS one week prior to Schuls's fatality. However, as stated above, there were at least three other then-14-year-olds hired while DAVIS was working at FLORENCE HARDWOODS, in addition to several 15-year-olds who were subject to the same child labor restrictions as 14-year-olds. For instance, DAVIS was the HR Manager in October 2021, when decedent Schuls—who was then 14 years old— applied for employment. Schuls's job application stated that he was a 9th grader, and Schuls checked "No" in response to the question "Are you 16 years of age or older?" DAVIS's signature block as "HR Manager" appears on the November 9, 2021, letter extending a job offer to Schuls to be a "lumber stacker after school."

87. During his September 2024 interview with criminal investigators, DAVIS admitted knowing that minors did "specific jobs on rare occasions" in the sawmill building. DAVIS acknowledged knowing from the beginning of his employment that minors worked in the stick stacker system in the sawmill building, but he denied ever knowing that minors worked in "the hole." DAVIS told investigators that he (erroneously in hindsight) believed that the stick stacker system—which was separated by a wall from sawing equipment—was not prohibited sawmill work under the child labor regulations.

88. On June 21, 2023, the DWD informed DAVIS that a work permit issued on June 16, 2023, for D.B. (see above) to work as a laborer was being revoked because the child was not old enough. On June 26, 2023, DAVIS emailed the DWD

34

to question whether the permit should have been revoked.  DWD replied in an email that any minors under the age of 16 were prohibited from working in manufacturing or processing occupations, and therefore could not work with lumber anywhere in a manufacturing facility.

89.	Even after DWD told DAVIS it was unlawful to work children under age 16 in manufacturing positions, FLORENCE HARDWOODS continued to employ B.S., a 14-year-old child, in the planer building, as shown in video footage of the planer building on June 27 and June 28, 2023.  Indeed, B.S.'s work included offloading boards from a piece of power-driven woodworking equipment—the rip saw—which resulted in an injury to B.S. on June 27 when a board hit him in the leg. (Witness statements obtained by administrative investigators from minor workers also indicated that other minors (aged 16 or 17) were working in the sawmill building on the days after the June 26, 2023, correspondence between DAVIS and DWD.)

90.	When OSHA arrived at FLORENCE HARDWOODS on the day of the Schuls fatality, DAVIS admitted that the company was continuing to employ workers under age 16.  DAVIS told OSHA that one minor's work permit had been revoked, but that FLORENCE HARDWOODS was going back and forth with the state regulator, so the company still had another minor under the age of 16 working. DAVIS told OSHA that the law allows minors to pull dry lumber.  (Note: that exception relates to sawmilling employment restrictions and does not affect the general prohibition on minors under 16 years old in manufacturing jobs).

91.     In September 2024, when criminal investigators asked DAVIS about the June 26, 2023, communication with Wisconsin DWD about the prohibition on the employment of minors under 16 in manufacturing jobs, DAVIS stated that he would have brought such a communication about the unlawfulness of employing children in certain areas of the facility to MARGARET MINERICK and RAY MILLS (the mill manager), but did not specifically recall doing so.  When criminal investigators asked DAVIS why workers under the age of 16 continued to be employed in the planer building in the days after DAVIS had been told that it was unlawful to do so, DAVIS expressed surprise that that had happened.

92.     Based on the above, there is probable cause to believe that FLORENCE HARDWOODS knew that its employment of minors violated child labor laws.  There is also probable cause to believe that JORDAN DAVIS was acting as an "employer" for purposes of the FLSA.  29 U.S.C. § 203(d).

## WILLFUL SHIPMENT OF HOT GOODS AND RELATED FALSE STATEMENTS

93.     This Affiant believes that there is probable cause that FLORENCE HARDWOODS and MARGARET MINERICK knowingly and willfully made false statements or representations to DOL that understated the volume of goods that were produced at the Florence facility within 30 days prior to the Schuls fatality, which was a fact material to DOL's efforts to prevent "hot goods" produced at establishments that employed illegal child labor from entering commerce.

### The FLSA Hot Goods Provision

94.     The FLSA prohibits a producer or manufacturer to ship or deliver for

shipment in commerce any goods produced in an establishment in or about which within thirty days prior to the removal of such goods therefrom any oppressive child labor has been employed. 29 U.S.C. §§ 212(a); 215(a)(4). Whether goods are "hot goods" are therefore determined by (1) the date they were "removed" from the establishment and (2) the last-in-time date of any oppressive child labor. *See* 29 C.F.R. §§ 570.104 through 570.111 (DOL interpretive regulations on hot goods provision). "Hot goods" status does not depend on the date that the goods were "produced" in the establishment, but rather the timing of removal within 30 days of any child labor violation.

95. According to the DOL regulations, "once any goods have been removed from a producing establishment within the above-mentioned thirty-day period [since the employment of any oppressive child labor], they are barred at any time thereafter from being shipped or delivered for shipment in commerce so long as they remain 'goods' for purposes of the [FLSA]." 29 C.F.R. § 570.111.

96. As described above, FLORENCE made extensive use of child labor, including oppressive child labor that continued until at least June 28, 2023, when 14-year-old B.S. worked in a manufacturing position in the planer building (and two days after Wisconsin DWD told DAVIS that minors could not work in the planer building). Under operation of the hot goods provision, therefore, any goods that had been produced in FLORENCE HARDWOODS would become "hot goods" if they were removed from FLORENCE HARDWOODS prior to on or about July 28, 2023.

*Knowledge of the Hot Goods Provision and Course of Dealing with DOL*

37

97.     WHD opened a child labor investigation after the June 29, 2023, death of Michael Schuls, and WHD investigators arrived at FLORENCE HARDWOODS on June 30, 2023.  According to the Narrative report of the WHD investigation, child labor violations were "clearly identified" after the "first site visit," and when a WHD investigator returned to the facility on July 6, 2023, she handed MARGARET MINERICK a Fact Sheet on the FLSA hot goods provision.

98.     Later that day or the next day, the WHD investigator presented MARGARET MINERICK with an "Objection to Shipment" letter, which further explained the hot goods provision of the FLSA and requested that FLORENCE HARDWOODS stop shipping goods.  As stated in the letter, because "WHD believes child labor violations [under the federal regulations] have occurred at the Florence, WI establishment in the past 30 days," the agency was requesting that FLORENCE HARDWOODS "voluntarily refrain from shipping any goods produced or manufactured at the facility, pending resolution of the investigation," and WHD warned that "shipping the goods…could result in further violation of the FLSA." The letter stated that, although WHD's requests created no legal obligation on FLORENCE HARDWOODS to refrain from shipping the goods, the DOL might file a civil action seeking a court order to stop shipment of the affected goods and other available remedies if FLORENCE HARDWOODS did not voluntarily agree to withhold the goods from shipment.  (Note that, consistent with the statutory provision, the Objection to Shipment Letter requested that FLORENCE HARDWOODS not ship "any" goods produced at the facility, without limitation on

38

the date the goods were produced.)

99.     On July 7, 2023, FLORENCE HARDWOODS, through legal counsel Jodi Labs, Esq., spoke with a DOL attorney (with initials L.R.), and then sent an email that said "following my discussion with [L.R.] this afternoon, Florence Hardwoods is voluntarily agreeing to refrain from shipping or delivering for shipment or otherwise putting into interstate commerce, any goods produced or manufactured at the Florence, WI facility during the time period of May 30, 2023- June 29, 2023."  Attorney Labs attached to her email MARGARET MINERICK's signed agreement that FLORENCE HARDWOODS "hereby agrees not to ship or deliver for shipment any of the goods identified above [in the Objection to Shipment Letter] in interstate commerce without providing this office [WHD] actual written notice at least three full business days in advance of the shipment."

100.     The subsequent emails between Attorney Labs and DOL attorneys reviewed by this Affiant to date do not appear to have recognized that goods produced before May 30, 2023, could become hot goods if removed from FLORENCE HARDWOODS.  Several subsequent emails between Attorney Labs and DOL attorneys refer to the restriction applying to those goods produced after May 30, 2023.  Therefore, this Affiant assumes for the purposes of this Affidavit that FLORENCE HARDWOODS was operating with a bona fide understanding that goods produced before May 30, 2023, could be shipped without violating the FLSA.

*Representations About How Many Goods Were Produced During June 2023*

101.     Even assuming that FLORENCE HARDWOODS believed that it could

39

ship products made before May 30, 2023, but not those made after May 30, 2023, there is probable cause to believe that FLORENCE HARDWOODS and MARGARET MINERICK falsely and fraudulently understated how many goods were made after May 30. The evidence suggests that FLORENCE HARDWOODS significantly understated to DOL the amount of wood that it had produced during that one-month period. FLORENCE HARDWOODS would have had a motive to understate the volume of goods, since by doing so it could freely sell the purportedly untainted goods without raising concerns that the goods were "hot" and excludable from commerce for downstream customers.

102. FLORENCE HARDWOODS represented to DOL that it "segregated" all goods produced from May 30, 2023, to June 29, 2023. On July 13, 2023, Attorney Labs emailed DOL, with a copy to MARGARET MINERICK, that FLORENCE HARDWOODS "keeps really good daily production records so they were able to identify what they produced during that time and segregate whatever was not already shipped off site, and then determined who actually received product." On July 14, 2023, a DOL attorney asked Labs to "find out what the value of the segregated material that was not shipped off site is," i.e., the value of the goods that FLORENCE HARDWOODS had produced during June.

103. On July 18, 2023, Labs, with a copy to MARGARET MINERICK, emailed DOL to provide a spreadsheet that purportedly reflected the value of the product that FLORENCE HARDWOODS had segregated for shipment as being produced in June 2023. According to metadata, the "last native author" of the

40

spreadsheet was "Margaret" with a "date created" date of July 18, 2023. The spreadsheet sent on July 18 to DOL listed the total value of the lumber that was being segregated as $276,211. The total board feet of segregated lumber listed on the spreadsheet was approximately 578,000. FLORENCE HARDWOODS records often report board feet in a numerical format "xxx.xxx," which, based on cross-references to other documents, indicates thousands of board feet.[2] Later that day, DOL sent an email asking for confirmation of the accuracy of the spreadsheet data, which Attorney Labs provided in another email on July 19.

104. Probable cause exists to believe the volume of lumber that FLORENCE HARDWOODS held back from shipment substantially understated the volume of lumber that was actually produced during the covered period of June 2023. This Affiant does not have production reports from FLORENCE HARDWOODS for June 2023 or other periods. However, a memo from a loan officer in bank records related to FLORENCE HARDWOODS indicates that the bank officer spoke with MARGARET MINERICK in July 2023, after the fatality, and MARGARET indicated that, during normal operations, it would take FLORENCE HARDWOODS about 2.5 days to produce 132.496 (132,496) board feet, which translates to approximately 53,000 board feet per day of normal operation. Based on payroll records, FLORENCE HARDWOODS operated five days a week. Therefore, assuming 21 workdays from May 31, 2023, until June 28, 2023 (production stopped

---

[2] A board foot is a unit of measurement in the lumber industry equal to a board that is 12 inches long, 12 inches wide, and one inch thick. For example, 100,000 board feet would often be recorded as 100.000.

the morning of the fatality), FLORENCE HARDWOODS would have been expected to produce about 1,113,000 board feet of lumber, nearly twice as much lumber as FLORENCE HARDWOODS told DOL had been produced.

105. Another data source—a record provided by FLORENCE HARDWOODS to the Wisconsin Department of Natural Resources (WDNR) during an environmental inspection—indicates that FLORENCE HARDWOODS processed in its kilns alone 408,128 board feet of lumber during June 2023. Kiln dried lumber does not include green lumber. Based on the fact that FLORENCE HARDWOODS processed 408,128 board feet of kiln dried lumber alone in June 2023, it is unlikely that the total volume of lumber (both green and dry lumber) produced at FLORENCE HARDWOODS in June 2023 totaled only 578,000 board feet.[3]

106. Based on the above, probable cause exists that FLORENCE HARDWOODS and MARGARET MINERICK knowingly provided false information to WHD about the volume of lumber that had been produced during the month preceding Schuls's fatality.

## FALSE ENVIRONMENTAL COMPLIANCE CERTIFICATIONS

107. I believe probable cause exists that FLORENCE HARDWOODS, MARGARET MINERICK, and RAY MILLS committed federal offenses on matters relating to the United States Environmental Protection Agency (EPA) compliance

---

[3] Kiln dried lumber did not appear to account—in volume of board feet—for the majority of FLORENCE HARDWOODS production. Based on the June 3, 2023, inventory report, lumber in the kilns or dried lumber accounted for approximately 30% of the board feet of lumber on inventory, with the remaining inventoried lumber being "green lumber."

42

certifications, including violations of false statement and/or obstruction statutes 18 U.S.C. § 1001(a)(3) and 18 U.S.C. § 1519.

*Clean Air Act Law and Permit Conditions*

108. The Clean Air Act is the primary federal law regulating the emissions of pollutants into the ambient air. The U.S. EPA administers the statute, which relies extensively on a cooperative federalism approach that delegates, subject to EPA approval and oversight, the issuance of Clean Air Act permits and enforcement to state or local agencies. In the State of Wisconsin, the WDNR has been delegated Clean Air Act permitting authority.

109. WDNR issued a Clean Air Act permit to FLORENCE HARDWOODS on May 15, 2018. All of the conditions set out in the permit were enforceable by both the WDNR and the U.S. EPA. The permit required FLORENCE HARDWOODS to use, inspect, and monitor various pollution control devices and measures.

110. MARGARET MINERICK and RAY MILLS were aware of the permit from before the time of its issuance. In early 2018, after the WDNR sent a proposed permit to FLORENCE HARDWOODS that included the installation and maintenance of a pressure drop monitor across a pollution control device called a cyclone, MILLS contacted an environmental consultant and obtained a letter stating that the monitor was not necessary. MARGARET MINERICK provided the letter to WDNR with a request that the permit not require the "unnecessary and costly" monitor. The WDNR rejected that request, explained the purpose of the

43

pressure drop monitoring device, and included the provision in the final permit.

111. Under the Clean Air Act, and as required in the permit issued to FLORENCE HARDWOODS, a "responsible official" must periodically certify a facility's compliance with permit requirements. The compliance certifications were due to the WDNR by March 1 of each year, and addressed compliance during the entirety of the preceding year. Each certification needed to disclose any deviations from permits on a deviation summary report. All certifications included the following:

> I have reviewed this facility's compliance status with respect to *ALL* air operation permit conditions for the reporting period specified in this compliance certification. Based on information and belief formed after reasonable inquiry, I certify that the statements and information in this document are true, accurate and complete.

112. On February 25, 2022, MARGARET MINERICK certified that FLORENCE HARDWOODS was in "Continuous Compliance" with its permit throughout 2021, meaning that "during the entire reporting period identified in this compliance certification, this facility was in continuous compliance with <u>all</u> conditions specified in the permit identified in this compliance certification."

113. On February 21, 2023, MARGARET MINERICK certified "Continuous Compliance" with the permit throughout 2022.

114. On February 26, 2024, RAY MILLS certified "Continuous Compliance" with the permit throughout 2023.

115. On March 4, 2024, WDNR inspectors conducted an on-site compliance evaluation at FLORENCE HARDWOODS. According to the final, written

44

inspection report, WDNR found that FLORENCE HARDWOODS had never complied with various permit conditions since May 15, 2018, i.e., since the permit was issued. Among other violations, WDNR found that FLORENCE HARDWOODS had failed to complete annual calibrations of pressure drop monitoring devices, failed to record the pressure drop across the cyclone, and failed to test particulate matter emissions.

116. According to handwritten WDNR inspection notes from the March 4 inspection, JORDAN DAVIS was identified as the air management contact at FLORENCE HARDWOODS. Albeit difficult to follow in parts, the notes indicate that when asked for records of pressure drop monitoring, FLORENCE HARDWOODS stated they "don't have" the records and "will start monitoring." When asked about annual calibration records for pressure drop monitoring devices, FLORENCE HARDWOODS stated that someone "couldn't come out to calibrate" and that related costs were "too expensive, $8-10K." When asked about internal inspection records for control devices, FLORENCE HARDWOODS personnel stated they "don't have" documentation of cyclone inspections "but will start."

## Further use of the SUBJECT ACCOUNT

117. A review of evidence obtained to date—including non-content information provided by Google, Inc. in response to a Section 2703(d) Order—show that MARGARET MINERICK used the SUBJECT ACCOUNT extensively to send or receive emails that are records subject to seizure under Section II of Attachment B. This Affiant previously filed a preservation request for the SUBJECT

45

ACCOUNT.

118. The Section 2703(d) Order return shows the SUBJECT ACCOUNT contains records of communications with workplace safety consultants (including WisCon, Trimedia, and the Wisconsin Safety Council) and FLORENCE HARDWOODS's workers compensation insurance carrier (Bitco). The SUBJECT ACCOUNT contains communications with OSHA, and with employment consortia (such as CESA8 and Northwest Wisconsin Technical College) and school officials (such as those in the Florence, Wisconsin, school system) who, based on the investigation, were involved in the process of recruiting or permitting the employment of minors at FLORENCE HARDWOODS. The SUBJECT ACCOUNT contains numerous communications related to financial condition, including banks (Stephenson National) and accountants (office of Andrew Davis CPA). The SUBJECT ACCOUNT contains numerous internal communications between MARGARET MINERICK and FLORENCE HARDWOODS personnel that are likely to include records subject to seizure under Section II of Attachment B, including numerous communications with JORDAN DAVIS (HR manager; office manager; involved in OSHA, child labor, environmental, payroll, and inventory matters), RAY MILLS (mill manager with involvement in OSHA, child labor, environmental, and production/inventory matters), Pam (Rukamp) Burkhard (former office manager), and Amy Orn (former office manager).

119. In addition to the return from the Section 2703(d) Order, I know from my training and experience that employees and, specifically, managers and owners,

46

of a business communicate via company-issued email addresses. Further, this investigation has revealed that MARGARET MINERICK emailed MILLS, DAVIS, Orn, and Burkhard. I am also aware that MARGARET MINERICK communicated with DOL officials, consultation agencies, and State of Wisconsin officials using the SUBJECT ACCOUNT regarding matters pertinent to this investigation. I also know from my training and experience that employees can forward, reply, or otherwise re-disseminate emails that they have had with officials with others. Such messages can contain commentary, opinions, or actions taken or withheld in reply to the official's original message, providing insight into the state of mind of the subject sending the email.

## REQUEST FOR SEALING

120. I further request that the Court order that all papers in support of this application, including the affidavit and search warrant, be sealed until further order of the Court. These documents discuss an ongoing criminal investigation, the scope and direction of which is not known to the public or to the subjects and targets of the investigation. This investigation relates to potential misconduct by a significant local employer in an economically disadvantaged small town. Accordingly, there is good cause to seal these documents because their premature disclosure may give targets an opportunity to destroy or tamper with evidence, notify confederates, improperly pressure witnesses against cooperation, or otherwise seriously jeopardize the investigation.

47

## ATTACHMENT A
## Matter No. 2024R00186

### Property to Be Searched

This warrant applies to information associated with email account margaret@minericklogging.com that is stored at premises owned, maintained, controlled, or operated by Google, Inc., a company headquartered at 1600 Amphitheatre Parkway, Mountain View, California 94043.

48

# ATTACHMENT B

## Particular Things to be Seized

### I. Information to be disclosed by GOOGLE, INC (the "Provider")

To the extent that the information described in Attachment A is within the possession, custody, or control of the Provider, regardless of whether such information is located within or outside of the United States, and including any emails, records, files, logs, or information that has been deleted but is still available to the Provider, or has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the Provider is required to disclose the following information to the government for each account or identifier listed in Attachment A:

a.     The contents of all emails associated with the account margaret@minericklogging.com from January 1, 2015, to present, including stored or preserved copies of emails sent to and from the account, wherever stored, including, draft emails, trash emails, spam emails, and any other folders in the user email account, the source and destination addresses associated with each email, the date and time at which each email was sent, and the size and length of each email;

b.     All records or other information regarding the identification of the account, to include full name, physical address, telephone numbers and other identifiers, records of session times and durations, the date on which the account was created, the length of service, the IP address used to register the account, log-in IP addresses associated with session times and dates, account

status, alternative email addresses provided during registration, methods of connecting, log files, and means and source of payment (including any credit or bank account number);

      c.     The types of service utilized;

      d.     All records or other information stored by an individual using the account, including address books, contact and buddy lists, calendar data, pictures, and files;

The Provider is hereby ordered to disclose the above information to the government within **14 days** of issuance of this warrant.

## II.    Information to be seized by the government

All records relating to violations of 29 U.S.C. § 666(e), 29 U.S.C. § 216(a), 18 U.S.C. § 1001, 18 U.S.C. § 1505, and/or 18 U.S.C. § 1519, involving FLORENCE HARDWOODS, MARGARET MINERICK, RAY MILLS, JORDAN DAVIS, AMY ORN, and/or PAMELA BURKHARD including:

Records relating to the Occupational Safety and Health Act (OSH Act).

Records relating to the Occupational Safety and Health Administration (OSHA).

Records relating to the Michigan OSHA.

Records relating to the control of hazardous energy (lockout/tagout).

Records relating to OSHA compliance.

Records relating to occupational safety and health management and/or compliance at the Minerick businesses: FLORENCE HARDWOODS, Minerick

50

Logging, Sagola Hardwoods, and Minerick Trucking (hereinafter "Minerick businesses").

Records relating to safety policies, procedures, and training.

Records relating to occupational safety and health management and/or compliance at FLORENCE HARDWOODS.

Records relating to workplace injuries or hazards at Minerick businesses.

Records relating to workplace injuries or hazards at FLORENCE HARDWOODS.

Records relating to the fatal injury to Michael Schuls.

Records relating to the desticker machine.

Records relating to OSHA communications with and inspections and/or investigations of Minerick businesses.

Records relating to OSHA communications with and inspections and/or investigations of FLORENCE HARDWOODS.

Records relating to ownership and managerial roles at Minerick businesses.

Records relating to ownership and managerial roles at FLORENCE HARDWOODS.

Records relating to the work and role of FLORENCE HARDWOODS employees and/or managers.

Records relating to the work and role of JORDAN DAVIS.

Records relating to the work and role of MARGARET MINERICK.

Records relating to the work and role of RAY MILLS.

51

Records relating to the work and role of Matt Olesky.

Records relating to financial condition of Minerick businesses.

Records relating to financial condition of FLORENCE HARDWOODS.

Records relating to financial condition of owners of FLORENCE HARDWOODS.

Records relating to corporate accounting for Minerick businesses.

Records relating to corporate accounting for FLORENCE HARDWOODS.

Records relating to tax returns and information for Minerick businesses.

Records relating to tax returns and information for FLORENCE HARDWOODS.

Records relating to the plant layout, technical operations, and equipment of FLORENCE HARDWOODS's facility.

Records relating to income or revenue derived from the operations of Minerick businesses.

Records relating to income or revenue derived from the operations of FLORENCE HARDWOODS's facility.

Records relating to income or revenue derived from the operations of the planer building at FLORENCE HARDWOODS.

Records relating to communications with or services of third-party safety consultants or consultative services.

Records relating to communications with or services of the Wisconsin Safety Council.

52

Records relating to communications with or services of WisCon.

Records relating to communications with or services of Trimedia.

Records relating to production levels at FLORENCE HARDWOODS.

Records relating to inventory at FLORENCE HARDWOODS.

Records relating to product shipments from FLORENCE HARDWOODS.

Records relating to sales by FLORENCE HARDWOODS.

Records relating to staffing and recruitment at FLORENCE HARDWOODS.

Records relating to job assignments at FLORENCE HARDWOODS.

Records relating to job recruiting services.

Records relating to Indeed.com.

Records relating to efforts to hire or recruit a safety director/safety manager.

Records relating to the Fair Labor Standards Act or its regulations.

Records relating to child labor or the employment of minors.

Records relating to federal child labor requirements and compliance.

Records relating to state child labor requirements and compliance.

Records relating to minors employed at FLORENCE HARDWOODS.

Records relating to the Wisconsin Department of Workforce Development.

Records relating to the U.S. DOL.

Records relating to the Wage and Hour Division of DOL.

Records relating to the Solicitor's Office or Regional Solicitor's Office of DOL.

Records relating to child work permits or child work authorizations.

Records relating to child apprenticeships.

53

Records relating to local schools and the employment or possible employment of students at FLORENCE HARDWOODS.

Records relating to economic consortia and the employment or possible employment of minors at FLORENCE HARDWOODS.

Records relating to the CESA8 consortium .

Records relating to Northwest Wisconsin Technical College.

Records relating to HR or hiring policies or practices.

Records relating to environmental compliance .

Records relating to the Clean Air Act.

Records relating to the U.S. EPA.

Records relating to the Wisconsin Department of Natural Resources.

Records relating to environmental permits for FLORENCE HARDWOODS.

Records relating to environmental compliance certifications.

Records relating to pollution control equipment.

Records relating to cyclones.

Records relating to pressure drop or pressure differential monitoring.

Records relating to environmental consultants.

Records relating to MidStates Contracting.

Records relating to knowledge of the above topics by FLORENCE HARDWOODS owners or managers.

54

Records relating to any attempt to cover-up, obfuscate, lie, or otherwise be untruthful to any federal official, including Department of Labor officials concerning the crimes under investigation.

Records relating to the account owner's or other subjects' of this investigation states of mind as it relates to the crimes under investigation.

As used above, the term "records" includes all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage.

55